In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 18-1054

BANKDIRECT CAPITAL FINANCE, LLC,

*Plaintiff, Counterdefendant-Appellant,*
*and*

TEXAS CAPITAL BANK, N.A.,

*Counterdefendant-Appellant,*

*v.*

CAPITAL PREMIUM FINANCING, INC.,

*Defendant, Counterplaintiff-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 10340 — **John Z. Lee**, *Judge.*

_____

ARGUED OCTOBER 31, 2018 — DECIDED JANUARY 9, 2019

_____

Before FLAUM, EASTERBROOK, and BRENNAN, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* BankDirect Capital Finance and Capital Premium Financing both participate in the market for loans to finance insurance premiums. Insurers want

to be paid up front for the full policy period, but many businesses prefer to pay by the month. A premium-financing loan makes both things possible. The client makes a down payment toward the annual premium and borrows the rest. It repays the loan monthly.

In 2010 Capital Premium, having exhausted the line of credit that financed its operations, approached its competitor BankDirect with a request for operating capital. BankDirect was willing to purchase the loans that Capital Premium made—and to pay Capital Premium to service those loans while they were outstanding—but with a big condition. BankDirect demanded, and got, a right to purchase Capital Premium's business outright after five years. The contract went into force in December 2010. (Actually there were four contracts, but we use the singular for simplicity.) The option to purchase could be exercised near the fifth anniversary. If BankDirect elected not to purchase Capital Premium, then either side could extend the term by notice given before January 4, 2016; otherwise the purchase-and-service deal would wrap up on January 31, 2016. Any extension could not exceed the contract's drop-dead date, June 1, 2018, after which neither side would have any obligation to the other.

BankDirect exercised the purchase option in November 2015, but Capital Premium refused to honor it. BankDirect filed this suit under the diversity jurisdiction, seeking to enforce the option to purchase. It treated Capital Premium's rejection of the purchase as a default, which entitled it to take measures for self-protection. This led Capital Premium to file a counterclaim. It demanded an injunction that would require BankDirect to continue purchasing the loans and paying it to service them.

BankDirect continued dealing with Capital Premium through May 1, 2017, when it seized several of Capital Premium's accounts and stated that it would no longer buy any loans from Capital Premium. This led Capital Premium to renew its request for an injunction. For its part, BankDirect withdrew its request for specific performance of the purchase. (It believes that the parties' relations have so soured that an acquisition would fail commercially.) BankDirect agreed to maintain the status quo until the court ruled.

Judge Gottschall concluded that Capital Premium is entitled to a preliminary injunction requiring BankDirect to continue business with Capital Premium in the same way it had been doing earlier. 2017 U.S. Dist. LEXIS 195519 (N.D. Ill. Nov. 29, 2017). The district court contemplated that the loan-purchase-and-service arrangement would continue while it resolved the dispute on the merits.

Unfortunately, several things went wrong.

First, the district court did not address the significance of the June 2018 terminal date. The judge may have thought that the suit would be over by then; at all events, she did not provide for what was to happen on June 1, 2018, if the litigation was ongoing.

Second, the language that the judge evidently intended to serve as the injunction left unresolved not only the effect of the drop-dead date but also other disputes. The last paragraph of the court's opinion reads:

> For the reasons discussed above, Capital Premium's motion for a preliminary injunction is granted. Accordingly, BankDirect is preliminarily enjoined from terminating Capital Premium as the servicer of loans that Capital Premium originates; interfering with Capital Premium's control of its deposit accounts; interfer-

> ing with Capital Premium's access to its Participation Interest; retaining the $1,000,000 it seized from Capital Premium's account on May 1, 2017; and seizing any additional funds from Capital Premium's accounts, including any portion of the $5,000,000 that BankDirect has demanded.

2017 U.S. Dist. LEXIS 195519 at *40. Much of the parties' dispute on appeal concerns the absence of attention to the contract's terminal date and the omission of any order with respect to BankDirect's purchase of loans that Capital Premium originates. Nor did the judge pin down ambiguous terms such as "interfering". Maybe the judge meant to grant whatever relief Capital Premium had requested, but the opinion does not say this—and Fed. R. Civ. P. 65(d)(1)(C) forbids incorporating another document (such as a motion) by reference.

Third, the district court failed to enter an injunction as a separate document under Fed. R. Civ. P. 65(d)(1)(C). Language in an opinion does not comply with Rule 65(d). See *Gunn v. University Committee to End the War*, 399 U.S. 383 (1970). Neither side reminded the district court of the need to enter an injunction.

Fourth, the district court did not require Capital Premium to post a bond, despite Rule 65(c), which says (emphasis added): "The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

Although BankDirect missed the significance of Rule 65(d), it was acutely aware of Rule 65(c). Contending that the injunction would cost it about $500,000 a month, it asked the

district court to require Capital Premium to post a substantial bond—for, in the absence of a bond, a litigant injured by an injunction later determined to have been improper does not have a remedy. See, e.g., *Coyne-Delaney Co. v. Capital Development Board*, 717 F.2d 385, 393–94 (7th Cir. 1983). That is why Rule 65(c) makes the effectiveness of a preliminary injunction contingent on the bond having been posted. *United States v. Associated Air Transport, Inc.*, 256 F.2d 857 (5th Cir. 1958); Charles Alan Wright & Arthur R. Miller, 11A *Federal Practice & Procedure* §2954 at 319 (3d ed. 2013). A judge might consider an indemnity of $0 (that is, no bond) "proper" when the suit is about constitutional principles rather than commercial transactions, but no one thinks that condition satisfied here.

The case was transferred to Judge Lee, who found that BankDirect is entitled to a bond of at least $7.5 million but insisted that it continue to obey the language of Judge Gottschall's opinion in the interim. In response to Capital Premium's assertions that it lacked the funds to secure a bond—the very situation that should have deferred injunctive relief, lest BankDirect be saddled with losses it could not recoup—Judge Lee repeatedly extended the time for the bond's posting. Finally, in November 2018, while this appeal was under advisement, Capital Premium posted a bond for $7.5 million. BankDirect was at last secured. Still, if it is right that the preliminary injunction is costing it $500,000 a month, the protection has only a short time left to run.

In addition to asking Judge Lee for the protection of a bond, BankDirect asked him to specify when the injunction would end. Judge Lee declined to make an independent decision on that subject. Instead he tried to divine Judge

Gottschall's intent about the matter—no easy task, as she had not said one word about it. Concluding that Judge Gottschall had meant the injunction to last at least as long as the suit remained pending, Judge Lee denied BankDirect's request for a terminal date. Similarly, Judge Lee assumed that Judge Gottschall must have wanted to compel BankDirect to go on purchasing loans from Capital Premium, even though the last paragraph of her opinion does not say that.

Our initial question is whether we have appellate jurisdiction. In addition to holding that statements in an opinion are not an injunction, *Gunn* concludes that the absence of an injunction satisfying Rule 65(d) prevents a direct appeal from a three-judge district court to the Supreme Court under 28 U.S.C. §1253 (1970 ed.). If that's how §1253 works, maybe the same is true about §1292(a)(1), which BankDirect invokes. We requested and have received supplemental memoranda about that subject.

*Burgess v. Ryan*, 996 F.2d 180, 183–84 (7th Cir. 1993), observes that §1253 and §1292(a)(1) differ in this respect. *Gunn* emphasized that appeals from district courts (even three-judge district courts) direct to the Supreme Court are supposed to be rare. The Justices evidently contemplated that dismissing the appeal under §1253 would allow an appeal to the court of appeals. *Gerstein v. Coe*, 417 U.S. 279 (1974); *Gunn*, 399 U.S. at 391 (White, J., concurring). How else could the violation of Rule 65(d) be corrected? See also *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 276 (7th Cir. 1992).

When a district court does not put an order into writing, it is so transparently ineffectual that neither side is adversely affected. That means no appeal, for an empty declaration has

no loser, and only a district-court loser can appeal. See *Bates v. Johnson*, 901 F.2d 1424 (7th Cir. 1990). But Judge Gottschall entered a written order that she expected BankDirect to obey. Judge Lee shared that view even after being reminded that Rule 65(c) makes the injunction's effectiveness depend on a bond. It would pile injury on injury to tell BankDirect that it not only was unprotected by a bond for a year but also could not even obtain appellate review of an order that the district court sees as a long-term injunction. See *Schmidt v. Lessard*, 414 U.S. 473 (1974) (reversing an injunction that violated the requirement in Rule 65(d)(1)(B) that every order "state its terms specifically"; this implies that at least some violations of Rule 65(d) do not defeat appellate jurisdiction).

We do not need to say anything about the merits, or more about Rule 65(c) and (d), because this injunction (as we now call the last paragraph of Judge Gottschall's opinion) should have contained a terminal date: June 1, 2018. As that date has passed, all we need do is vacate the injunction and remand so that the district court can decide whether either side has broken a promise, and if so what damages are available.

Some language in the district court's opinion suggests that Judge Gottschall saw the initial end date of January 31, 2016, as material only if BankDirect declined to exercise its purchase option. If Capital Premium became a subsidiary of BankDirect, all of the contract's deadlines would be meaningless. Judge Gottschall observed that BankDirect had exercised its option, which meant, she concluded, that the absence of a renewal notice before January 4, 2016, did not cause the purchase-and-service obligations to end on January 31, 2016. If this is right, perhaps the same is true about

June 1, 2018: that date loses significance if BankDirect buys the business.

The problem with this line of argument is that BankDirect has *not* bought Capital Premium's business. It tried to, but Capital Premium refused to execute that transaction. (Whether Capital Premium was privileged to make that decision, or instead acted wrongfully, is for the district court to consider on remand.) Because the sale did not close, the parties remain in an arms'-length business transaction to which the dates are as important as if BankDirect had never tried to exercise its option. And the most important date is June 1, 2018. If the terminal date is extended past January 31, 2016, the "extended commitment date and new maturity date shall in any such case not be later than June 1, 2018". So if BankDirect's unsuccessful effort to buy Capital Premium's business is treated as extending the deal's initial date past January 31, 2016, this clause sets a limit.

No sensible commercial party wants to be trapped in a long-term relation. That's why contracts such as this include drop-dead dates. Yet Capital Premium maintains that BankDirect could not get out by exercising the option to buy the business—and, precisely *because* Capital Premium refused to honor its commitment to sell, BankDirect can't get out any other way, ever. The carefully drafted language of this contract dispels any suggestion that BankDirect was indifferent to the risks of being locked into a money-losing relation, of indefinite duration, with a firm that it does not trust. This contract means what it says.

The injunction is vacated, and the case is remanded with instructions to award BankDirect damages for time the injunction has extended past June 1, 2018, and to determine

whether either side owes damages to the other for breach of contract. The mandate will issue today, so that the injunction terminates immediately.